UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2006 JUL 20 P 3:47

U.S. DISTRICT COURT
DISTRICT OF MASS.

RECTRIX AERODROME CENTERS, INC.,

                    Plaintiff,

          against-

BARNSTABLE MUNICIPAL AIRPORT
COMMISSION, MICHAEL A. DUNNING,
BRUCE P. GILMORE, LARRY F.
WHEATLEY, QUINCY MOSBY and
FRANCISCO SANCHEZ,

                    Defendants.

:
:
:
:   Civ. A. No.
:   **06 CA 11246 RGS**
:
:   **COMPLAINT**
:
:
:   JURY TRIAL DEMANDED
:
:
:
:   MAGISTRATE JUDGE _____

Plaintiff Rectrix Aerodrome Centers, Inc. ("Rectrix"), for
its complaint against defendants Barnstable Municipal Airport
Commission (the "BMAC"), Michael A. Dunning ("Dunning"), Bruce
P. Gilmore ("Gilmore"), Larry F. Wheatley ("Wheatley"), Quincy
Mosby ("Mosby") and Francisco Sanchez ("Sanchez"), alleges:

## PRELIMINARY STATEMENT

1.   This action arises out of defendants' illegal scheme
to use their control of the Barnstable Municipal Airport in
Hyannis, Massachusetts (the "Airport") to prevent Rectrix, an
aviation services company, from competing with the Airport's
monopoly over the sale of jet fuel at the Airport.  Defendants
have carried out their illegal scheme, which has severely
damaged Rectrix, in order to continue their long-standing

RECEIPT #_____
AMOUNT $ 350.00
SUMMONS ISSUED ___
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK _____

practice -- in violation of federal law -- of diverting revenues from their Airport monopoly for use by the Town of Barnstable, Massachusetts (the "Town") for non-Airport purposes.

2. Rectrix became a victim of defendants' scheme in connection with a 2002 lease with the Airport, under which Rectrix was to build and operate a hangar for private jets (the "Rectrix Lease"). The Rectrix Lease also provided that Rectrix was entitled to apply to the BMAC to expand its scope of operations to become a provider of aviation services ("fixed base operator" or "FBO") consistent with the rules and regulations in effect at the Airport.

3. The actual rules and regulations in effect at the Airport -- the so-called "Minimum Standards" -- required that FBOs be permitted to provide fuel service and sell jet fuel at the Airport. However, such an expansion of Rectrix's operations threatened defendants' ability to maximize the funds diverted for use by the Town by maintaining the Airport's monopoly over the sale of jet fuel. Accordingly, defendants intentionally concealed the applicable Minimum Standards from Rectrix and other tenants.

4. After Rectrix ultimately was able, in 2004, to obtain a copy of the Minimum Standards, it applied to become an FBO, as it was entitled to do under the Rectrix Lease. In response, defendants refused to give proper or good faith consideration to

2

Rectrix's application and, instead, engaged in a malicious campaign of intimidation, retaliation and discrimination against Rectrix and its President, in order, among other things, to prevent Rectrix from ever selling jet fuel at the Airport.

5.    Most recently, for example, the BMAC required that Rectrix enter into a memorandum of understanding ("MOU") before permitting Rectrix to fuel aircraft it owns or manages under exclusive contract.  After Rectrix signed the MOU (under protest because the requirement was discriminatory), Rectrix entered into exclusive management contracts with two aircraft companies. Immediately thereafter, the BMAC intentionally reneged on its MOU commitments, among other things, by nonetheless refusing to permit Rectrix to fuel aircraft that are subject to those exclusive management contracts.

6.    Rectrix has invested millions of dollars in its business at the Airport.  As a result of defendants' illegal scheme, Rectrix thus has been improperly prevented from selling jet fuel at the Airport and has been otherwise severely hampered and delayed in exercising its rights at the Airport.  Defendants have pursued their illegal scheme even though the expansion of Rectrix's activities at the Airport and its investment in and development of those activities will create local jobs and improve the local economy.

3

7.   Moreover, defendants' diversion of the Airport's revenues to the Town -- for which the Airport's monopoly on the sale of jet fuel provided a significant source -- violated undertakings the BMAC made to the federal government to secure over \$12,000,000 in federal grants for various Airport improvements.  The BMAC was required to represent, and did represent, to the federal government that it would use all revenues generated from the Airport for airport purposes only, that it would permit aircraft owners to fuel their own aircraft and that it would not grant exclusive rights to any person to conduct aeronautical services at the Airport, including the right to sell aviation fuel products.

8.   Defendants thus have, among other things, engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), unlawfully maintained the BMAC's monopoly over the sale of jet fuel in violation of the Sherman Act, violated Rectrix's constitutional rights, breached agreements with Rectrix and interfered with Rectrix's agreements with third parties.  Accordingly, Rectrix brings this action to seek specific performance of its right to dispense jet fuel to aircraft it manages under its agreement with the Airport, to enjoin defendants from harassing Rectrix by attempting to evict it and to recover compensatory damages, as

4

well as punitive and treble damages, for defendants' egregious misconduct.

**PARTIES**

9.   Plaintiff Rectrix is a Massachusetts corporation, with its principal place of business at 730 Barnstable Road, Hyannis, Massachusetts 02601.  Rectrix is engaged in providing hangar space, pilot lounges and valet services to private jets that it owns, operates, leases or manages.  Rectrix and Rectrix Aviation, Inc. ("RAI") are subsidiaries of Rectrix Aviation Services, Inc.  RAI initiated the Rectrix project at the Airport, entered into the Rectrix Lease and later assigned the lease to Rectrix.

10.   Defendant BMAC is a Massachusetts municipal corporation authorized by statute to operate the Airport, with its principal place of business at the Airport.

11.   Defendant Dunning is an individual residing at 399 Old Jail Lane, Barnstable, Massachusetts 02630.  Dunning is and has been a member of the BMAC since in or about 2000, served as its chairman since in or about 2001 until in or about June 2005, and is the chairman of the Real Estate Sub-Committee and a member of the Planning and Development Sub-Committee of the BMAC.  Dunning also is a member of the law firm of Dunning & Kirrane, L.L.P., whose offices are in Mashpee, Massachusetts.

5

12. Defendant Gilmore is an individual residing at 214 Park Avenue, Centerville, Massachusetts 02632 and has been and continues to be counsel to the BMAC.

13. Defendant Mosby is an individual residing at 116 Foxglove Road, Centerville, Massachusetts 02632 and, since in or about 2001, has been and continues to be Manager of the Airport.

14. Defendant Sanchez is an individual residing at 41 Cypress Street, Buzzard's Bay, Massachusetts 02532 and, since 1994, has been and continues to be the Airport Assistant Manager.

15. Defendant Wheatley is an individual residing at 608 Old Post Road, Cotuit, Massachusetts 02635 and, since at least 2002, has been and continues to be a commissioner of the BMAC and is Chairman of the BMAC's Finance Sub-Committee.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this case pursuant to 18 U.S.C. § 1964 (c), 28 U.S.C. §§ 1331, 1337, 15 U.S.C. §§ 2, 15, and 26 and the principles of supplemental jurisdiction set forth in 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to 15 U.S.C. §§ 22, 26, 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), in that plaintiff does business in this District and defendants are located in this District, the conduct alleged herein occurred in this District, all the defendants transact their affairs or have

6

an agent or agents transact their affairs in this District, and the ends of justice require that other parties residing in other Districts be brought before this Court.

## FACTUAL BACKGROUND

## A.   The Airport, The BMAC And The Minimum Standards

18.   The Airport is owned by and provides air transportation services for the Town, which includes the villages of Hyannis, Osterville, Centerville, Cotuit, Marstons Mills, Barnstable Village and West Barnstable.  The Airport was opened in 1928 and is the third largest and busiest airport in Massachusetts.  It has over 43 tenant businesses operating on the property.

19.   The BMAC is charged with operating and maintaining the Airport, which has received and continues to receive federal funds for various improvements and operations pursuant to 49 U.S.C. §§ 47101 et seq. (commonly referred to as the "Airport and Airway Improvement Act").

20.   To receive such federal funding, the BMAC was required to make, and has made, numerous written representations, known as "grant assurances," to the federal government.  These grant assurances include, but are not limited to, assurances that: "the revenues generated by [the Airport] will be expended for the capital or operating costs of the [A]irport;" the BMAC will not exercise or grant any right or privilege which prevents any

person, firm or corporation operating any aircraft on the
Airport from performing any services on its own aircraft,
including but not limited to self-fueling of such aircraft; the
BMAC will not allow anyone the exclusive right at the Airport to
conduct any aeronautical services, including the sale of
aviation fuel; and the BMAC will make the opportunity to engage
in commercial aeronautical activities available to anyone
meeting reasonable minimum standards established by the BMAC.
The Federal Aviation Administration (the "FAA") requires that
"[o]nce the airport sponsor has established minimum standards,
it should apply them objectively and uniformly to all similarly
situated on-airport aeronautical activities and services."   FAA
Advisory Circular 150/5190-5.

     21.  In March 1988, the BMAC adopted the Minimum Standards,
entitled "Standards of Conduct For Persons and Businesses at the
Barnstable Municipal Airport," which have never been revoked or
superseded by the BMAC.  Among other things, these Minimum
Standards provide that a "[f]ixed base operator shall provide
all fuel services, including the sale and storage of 80-octane,
100-octane, and jet fuel."

     22.  Notwithstanding these Minimum Standards, commencing in
approximately 2000, the BMAC and other defendants conceived and
implemented a scheme to fraudulently and unlawfully maintain a
monopoly on the sale of all jet fuel at the Airport by

preventing FBOs from ever selling jet fuel at the Airport. In August 2000, the BMAC drafted several pages of bogus standards -- known as the Self-Service Standards -- purporting to "reserve the exclusive right unto [the BMAC] to sell jet fuel on the Barnstable Airport," whether in connection with self-fueling or otherwise. The Self-Service Standards are contrary to both FAA regulations requiring an airport sponsor such as the BMAC to permit self-fueling, including for jet fuel, and the Minimum Standards, and do not supersede the Minimum Standards.

23. Instead of providing new Airport tenants with a copy of the Minimum Standards -- as it should have done and as is standard practice at airports throughout the United States -- the BMAC fraudulently disseminated to tenants the Self-Service Standards as if these were the applicable rules and regulations in effect at the Airport. Thus, FBOs at the Airport were not aware of the existence of the Minimum Standards.

24. As a result of defendants' fraudulent scheme, which included concealing the Minimum Standards, no FBOs at the Airport were self-fueling their own aircraft with jet fuel or selling jet fuel to third parties. Rectrix also became a victim of this scheme.

**B.  Defendants Concealed The Existence
Of The Minimum Standards From Rectrix
To Wrongfully Protect The BMAC's Jet Fuel Monopoly**

25.  In August 2002, the Town, acting through the BMAC, as

lessor, and RAI, as lessee, entered into the Rectrix Lease, a

long-term land lease for space at the Airport.  The Rectrix

Lease was for 49,400 square feet and for a term of twenty years,

with options to renew for two successive ten-year periods.

26.  Article Four of the Rectrix Lease provided, in

pertinent part, that the "Lessee shall not conduct or permit to

be conducted on said premises … aircraft refueling activities

specifically related to, and including resale of aviation or jet

fuels, all subject to 2(b) below" (emphasis supplied).  Section

2(b) of Article Four specifically grants Rectrix the right to

submit in writing to the BMAC its "desire to modify or expand

its scope of operation," which "may be subject to negotiable

rates and charges, with agreed upon terms and conditions to be

executed by both parties on separate letters of agreement."

Section 2(b) thus expressly contemplates that Rectrix had the

right to seek to expand its operations, including to fuel its

own aircraft and to sell jet fuel to third parties.

27.  Although Article Three of the Rectrix Lease provides

that the "Airport rules and regulations in effect at the time of

the signing of this lease are attached as Exhibit B," the

Minimum Standards were not so attached.  Instead, defendants

10

sent RAI a copy of the Self-Service Standards in the fall of 2002.

28. Effective January 1, 2003, with the BMAC's consent, Rectrix replaced RAI as lessee under the Rectrix Lease.

29. On March 24, 2003, in response to Rectrix's counsel's request for a full copy of the Rectrix Lease, the BMAC again concealed the Minimum Standards by sending to Rectrix's counsel by mail a copy of the lease that again did not attach the Minimum Standards. At various times, defendants Dunning, Gilmore, Mosby and Sanchez falsely represented to Rectrix that the Self-Service Standards were the appropriate rules and regulations in effect.

30. Moreover, defendant Mosby falsely told Rectrix's President, Richard A. Cawley ("Cawley"), and others at Rectrix that under the Airport's rules and regulations, Rectrix could never pump jet fuel either for self-fueling or for sale to third parties.

31. In January 2004, Cawley telephoned defendant Mosby and asked him for a copy of the entire Minimum Standards. In response, on January 22, 2004, Cawley received a facsimile with a coversheet that referenced the "BMA Standards" and stated: "I hope that you will find this information helpful for your research and please do not hesitate to call our office with any additional assistance you may require."

11

32.  The facsimile contained only the Self-Service Standards -- two-pages entitled "Self-Service Standards" and four pages entitled "Guidelines For Building, Alteration and Improvement At The Barnstable Municipal Airport."

33.  Shortly after receiving this facsimile, Cawley called defendant Mosby and asked him specifically if there were any other standards at the Airport.  Mosby falsely represented that the standards contained in the facsimile were all of the BMAC standards that existed.

34.  On numerous occasions thereafter, Cawley spoke by telephone with defendants Dunning, Mosby and Sanchez and requested copies of the Airport's Minimum Standards.  Each of the defendants represented to Cawley on several occasions that no such Minimum Standards existed.

35.  In the spring of 2004, Cawley received unsolicited calls from a person who claimed to work for the BMAC.  The person told Cawley that the Airport's Manager, defendant Mosby, and Assistant Manager, defendant Sanchez, were withholding from Rectrix the Airport's true rules and regulations -- the Minimum Standards.

36.  On or about June 21, 2004, Cawley contacted Horsley Witten Group, Inc. (formerly Horsley & Witten, Inc.) ("Horsley Witten"), Rectrix's engineering consulting firm that had been working on projects for the BMAC and also designing Rectrix's

12

hangar, among other things.  Cawley asked Horsley Witten to send him a copy of the standards that had been provided to them for the work they were doing for the BMAC.  At the time, Horsley Witten was working on the Airport's Master Plan, designing the Airport's new federally subsidized terminal, as well as working on Rectrix's new hangar and other projects for Rectrix.  Cawley received from Horsley Witten the same Self-Service Standards that he had received previously.

37.  Also in June 2004, Cawley telephoned defendant Sanchez and asked if these were all of the standards that existed.  Sanchez told him during that telephone conversation -- for the first time -- that there were additional standards.  Cawley requested a copy of the additional standards, but Sanchez did not comply with this request.

38.  Finally, on June 23, 2004, Cawley met with defendant Sanchez at the Airport office.  He advised Sanchez that he was not going to leave without a copy of the real Minimum Standards. Reluctantly, and in the sight of Cawley, Sanchez went to another office and pulled out a document that contained the Minimum Standards.  Sanchez dropped them on the table and said in substance: "There, are you happy now?"

**1.  By Applying To Become An FBO And To Sell Jet Fuel
Rectrix Threatened The Airport's Monopoly On
Jet Fuel Sales And The Revenue Diversion Scheme**

39.  After reviewing the true Minimum Standards in effect,
Rectrix determined that these standards would allow Rectrix to
provide services as an FBO, including selling jet fuel.  Rectrix
thereafter made the business decision to become a full-service
FBO and to provide aviation services at the Airport, including
the sale of jet fuel.

40.  Cawley met with defendant Mosby to discuss Rectrix's
plans.  Defendant Mosby acknowledged that the Minimum Standards
provided FBOs the right to sell jet fuel -- both to self-fuel
and to sell jet fuel to third parties.  Mosby encouraged Rectrix
initially to pursue only self-fueling and discouraged Rectrix
from seeking to sell jet fuel to third parties.  Rectrix began
the costly and time-consuming process of drawing up new plans
and business models.  Between June and October of 2004, however,
as Rectrix attempted to pursue the expansion of its operations,
the BMAC and other defendants subjected Rectrix to a pattern of
runaround and delay, including inviting Cawley to BMAC Committee
meetings and then not allowing him to participate.

41.  Finally, in October 2004, Rectrix delivered a letter
to defendant Mosby advising him that Rectrix "wishe[d] to expand
its scope of operation, thus becoming a Full Service Fixed Based
Operator (FBO) at the Barnstable Municipal Airport."  Rectrix

14

warranted that it met or exceeded any and all financial
requirements of the FBO standards and that it had a "very high
degree of integrity and professionalism, meeting and exceeding
your [the Airport's] minimum standards." Rectrix requested that
its application be put on the Airport's next regularly scheduled
agenda. Mosby signed the letter and accepted Rectrix's $100,000
"good faith deposit." Two months later, on December 20, 2004,
defendant Mosby returned the "good faith deposit" check by
certified mail in a letter to Rectrix that was copied to
defendant Dunning.

## C.  Defendants' Campaign Of Intimidation, Retaliation And Discrimination Against Rectrix To Prevent Rectrix From Selling Jet Fuel

42.   Rectrix attempted to demonstrate -- and guarantee --
that it would increase, not decrease, the Airport's revenues
associated with the sale of jet fuel. The BMAC, however, never
fairly and honestly considered Rectrix's request to begin
selling jet fuel. Instead, as set forth below, various
defendants deprived Rectrix of its right to their honest
services and intimidated, retaliated and discriminated against
Rectrix -- all to protect the Airport's monopoly on the sale of
jet fuel, the revenues from which were being illegally diverted
for use by the Town.

**1.  Commissioner Wheatley's Efforts To Prevent Rectrix From Selling Jet Fuel And Interfering With The Revenue Diversion Scheme**

43.  On November 17, 2004, defendant Wheatley visited Rectrix's offices in Sarasota, Florida, and met with Cawley for more than an hour.  During this meeting, Wheatley admitted to Cawley, in substance, that the Town was receiving approximately $1 million per year from the Airport.  When Cawley pointed out to Wheatley that revenue diversion for non-Airport purposes was illegal, Wheatley admitted that it was, but said, in substance, that it would be bad for Rectrix to become known on the Cape as the company that caused city workers to be laid off.   While Wheatley agreed that Rectrix ought to be able to self-fuel, he advised Cawley that the BMAC would never allow Rectrix to pump jet fuel.

44.  Wheatley repeated some of these statements to Cawley and an executive of RAI, again mentioning that Airport revenues were being used to pay Town expenses.  The RAI executive was surprised to hear this statement because he knew such activity was illegal.

45.  During a later telephone call, defendant Wheatley also told Cawley in substance that the FAA looks the other way on revenue diversion and that revenues from the Airport were going to stay with the Town no matter what Rectrix did.

16

**2. Defendant Mosby Also Acknowledged The Illegal Diversion But Told Rectrix The FAA Would Do Nothing About It**

46. In conversations with Cawley, defendant Mosby admitted to Cawley that he knew the Town was not supposed to be using Airport funds for Town expenses but that there was not enough money at issue to start an FAA investigation. Cawley also told defendant Mosby that the FAA grant assurances would not allow the diversion of revenue, and defendant Mosby told Cawley that everybody looks the other way, including the FAA.

**3. Commissioner Dunning Threatened Rectrix's President**

47. On January 11, 2005, Cawley met with Dunning in an attempt to resolve open issues surrounding Rectrix's application to become a fully operating FBO at the Airport. During the conversation, Dunning told Cawley that Rectrix would never be permitted to sell jet fuel at the Airport. When Cawley explained that the BMAC's unfair treatment of Rectrix would leave Rectrix with no choice but to initiate litigation, Dunning told Cawley in substance, "You better watch your back." When Cawley asked Dunning if he was threatening him, Dunning responded in substance, "You bet I am."

**4. The BMAC And Commissioner Dunning Interfered With Rectrix's Contract For Engineering Services**

48. In another attempt to wrongfully deter and delay Rectrix's efforts to sell jet fuel in competition with the BMAC, certain defendants knowingly and intentionally interfered with

17

Rectrix's business relations with the engineering firm that Rectrix was using to design its hangar and other facilities at the Airport.

49.  In early April 2005, Dunning contacted Horsley Witten -- the engineering consulting firm that had been working on projects for Rectrix since 2002 as well as working on engineering and permitting for the Airport's new multi-million dollar terminal and associated projects -- and told them that he considered Horsley Witten's work for Rectrix at the Airport to constitute a conflict of interest.  By facsimile dated April 14, 2005, on Dunning & Kirrane, L.L.P. letterhead, Dunning advised the Senior Project Manager for Horsley Witten that the BMAC did "not approve work [by Horsley Witten for Rectrix] in connection with the setting and design of a fuel farm, nor would we approve work on areas not presently under lease to Rectrix or inconsistent with limitations imposed in the Rectrix lease," obviously referring to the limitation in the Rectrix lease on fueling activities.  Dunning also advised Horsley Witten that the BMAC "has no objection to [Horsley Witten] performing other engineering services at other 'potential locations' provided that no work at the [Barnstable] Airport is included in [that] definition."

50.  Horsley Witten thereafter informed Rectrix that they could no longer continue to perform certain Airport work for

18

Rectrix. As a result, Rectrix hired another engineering firm to design the proposed fuel farm and incurred additional expenses in the amount of approximately $20,000.

## 5.   The BMAC And Defendants Dunning And Gilmore's Efforts To Prevent Rectrix From Fueling Aircraft

51.   The BMAC and certain defendants, including Dunning and Gilmore, also took steps to prevent and delay Rectrix from self-fueling, in addition to fueling other aircraft.

52.   During the Spring and Summer of 2005, defendants Dunning and Mosby told Cawley that if Rectrix had a fuel tank it could self-fuel. However, defendants Dunning and Mosby knew that at that time Rectrix did not own or have access to a fuel tank. On October 3, 2005, however, Rectrix signed an agreement with another FBO at the Airport, Air Cape Cod, to lease one of its tanks so that Rectrix could self-fuel and possibly fuel other aircraft with jet-fuel.

53.   Although the Rectrix hangar opened on September 1, 2005, it was not until after months of meetings and calls with the BMAC that Rectrix finally obtained permission to self-fuel and fuel planes it leased or managed at a December 20, 2005 BMAC meeting.

54.   Specifically, the December 20 resolution provided that Rectrix could enter into a self-fueling agreement such that for "aircraft owned, leased under exclusive contract for 60 days or

19

more, **or managed under exclusive contract for 60 days or more;
Rectrix is entitled to self-fueling** provided that it owns the
Air Cape Cod tank, and that said tank has been determined to be
of sound condition suitable for the task. Or alternatively,
Rectrix may elect to submit a plan to develop its own fuel tank
consistent with the Airport Master Plan..." (emphasis supplied).
Essentially, the BMAC gave Rectrix permission to fuel through an
existing storage tank of an Airport FBO (Air Cape Cod) or obtain
permission to set up a fuel farm. Regardless of which path
Rectrix chose, the BMAC made sure that it was blocked or
delayed.

55. Although Rectrix had the right to dispense jet fuel in
accordance with the BMAC's December 20 resolution, the BMAC and
defendants purporting to act on its behalf would not allow
Rectrix to do so without first entering into an MOU. On January
19, 2006, Rectrix and the Airport entered into an MOU that
required Rectrix to purchase its jet fuel from the BMAC at a
price that was significantly higher than it would have cost
Rectrix to obtain jet fuel from another supplier. The MOU
expressly stated that Rectrix could not sell fuel to third
parties but that it could fuel aircraft it owned, as well as
those aircraft leased or "managed under exclusive contract" for
more than sixty days. The term of this MOU was 120 days. Other

FBOs were not required to enter into an MOU to self-fuel or
dispense fuel to leased or managed aircraft.

### a.    The Fuel Tank Incident

56.    The safest and most efficient way for Rectrix to self-
fuel and dispense fuel to leased or managed aircraft would have
been to lease one of Air Cape Cod's fuel tanks, but the BMAC
would not allow this.  Instead, it required Rectrix to purchase
the fuel tank from Air Cape Cod, which meant that Air Cape Cod
would have to lease to Rectrix the land on which the tank was
located.

57.    At the December 20, 2005 BMAC meeting, defendant
Wheatley added language to the resolution requiring Rectrix to
purchase the tank from Air Cape Cod and to lease the ground
underneath the tank from the BMAC.  No similar requirements were
placed on other Airport tenants who were using the tank of
another FBO, Griffin, to self-fuel propeller planes.

58.    On January 2, 2006, Air Cape Cod responded to this
retaliation against itself and Rectrix by seeking relief from
the FAA.  On March 15, 2006, the FAA ruled that the BMAC was
unjustly discriminating against Air Cape Cod in violation of FAA
Sponsor Assurance No. 22.a, which states that an airport will be
made "available as an airport for public use on reasonable terms
and without unjust discrimination to all types, kinds and
classes of aeronautical activities, including commercial

21

aeronautical activities offering services to the public at the airport." The FAA ultimately ruled that Air Cape Cod could not be required to lease the land on which the tank was located to Rectrix or to sell the tank to Rectrix.

59. It was only as of May 8, 2006, after much unnecessary time and expense, that Rectrix was finally able to reach an agreement with the BMAC and Air Cape Cod to fuel through Air Cape Cod's fuel tank. Thus, Rectrix was forced to fuel at the Airport's higher prices from September 1, 2005 until May 8, 2006 and lost the profits it could have made from fueling aircraft it managed.

### b. The Fuel Farm

60. Rectrix did not fare any better with the other alternative Dunning had proposed -- operating its own fuel farm. Despite being told repeatedly by the BMAC that no additional space existed at the Airport on which to place a fuel farm, the BMAC required Rectrix to present detailed plans for the proposed fuel farm, including potential locations.

61. The BMAC then responded by suggesting that there would not be any space available that would meet environmental requirements because of the Airport's new terminal and fuel farm. The BMAC suggested to Rectrix that it construct a fuel farm within the confines of its leasehold, which would be difficult and cumbersome at best because it would restrict other

uses of Rectrix's leasehold that Rectrix had spent hundreds of thousands of dollars to obtain. Instead, Rectrix submitted plans for proposed alternative locations for its fuel farm. The BMAC refused to even rule on this request.

### c.     The Hangar

62.  Defendant Dunning also deliberately planned to block Rectrix not only from any ability to sell jet fuel but also to use its hangar. In or about the Spring of 2005, Dunning oversaw plans for the BMAC to locate the Airport's own fuel farm yards away from Rectrix's ramp, which would have created an obviously dangerous situation for Rectrix's planes because taxiing would hamper the ingress and egress of Rectrix's planes to its own hangar. The proposed location for the Airport's fuel farm would have violated the Rectrix Lease, which expressly states that the Airport may not interfere with Rectrix's ability to use its ramp.

63.  Rectrix only learned about defendant Dunning's plan from another FBO at the Airport. Cawley, of course, asked the BMAC to move the proposed location. Although it was quite obvious that a fuel farm situated right outside of Rectrix's hangar would impede Rectrix's ability to use its hangar in violation of FAA regulations and the Rectrix Lease, the BMAC required Rectrix to conduct an expensive survey to find alternative locations for the fuel farm. It was only after

Rectrix hired an engineering firm to demonstrate how the proposed fuel farm site would impact Rectrix that the BMAC and Dunning agreed to relocate the proposed site. Although Rectrix offered alternatively to develop a fuel storage area in conjunction with the Airport, this offer was refused. Rectrix incurred over $30,000 in unnecessary expenses associated with the BMAC's proposed choice to locate the fuel farm in a place that would have interfered with Rectrix's ability to use its ramp.

## 6.   The BMAC's Repeated Delays

64.   The BMAC consistently has delayed approvals that Rectrix needed. For example, Rectrix was delayed in obtaining approval for lease amendments, requests for additional space for ramp access and other rights for anywhere from three to six months. Almost every time Rectrix sought to expand its operation or needed BMAC approval, the BMAC would not only delay the approvals from meeting to meeting, it would create additional requirements for Rectrix that were not imposed on other Airport tenants or FBOs. For example, Dunning delayed approval for ramp parking rights by calling for a pretextual investigation into environmental and noise concerns associated with use of the ramp. The BMAC, Dunning and Gilmore continue to delay in hearing Rectrix's request for additional space and approval of its proposed fuel farm location.

65. The delay of almost nine months from when Rectrix opened its hangar until it could actually fuel aircraft it owns or manages has resulted in Rectrix losing a substantial amount of revenues from Bombardier Aerospace Corporation ("Bombardier"), CitationShares Management LLC ("CitationShares") and other potential operators.

**7. The BMAC's Continued Discrimination And Retaliation**

66. On October 20, 2005, Rectrix sent the FAA a Part 13 Letter Complaint setting forth the unfair treatment it received at the hands of defendants. In a showing of good faith, and in the hope that these issues could be remedied in an amicable and professional manner, Rectrix withdrew the complaint and entered into negotiations with the BMAC. However, when the BMAC continued its pattern of retaliation against Rectrix and caused further delays and expense, Rectrix had no choice but to file an amended Part 13 Complaint, adding the issue of revenue diversion and discussing the BMAC's retaliatory conduct.

67. The BMAC has continued its retaliation against Rectrix for, among other things, filing the Part 13 Complaint by taking baseless actions that were not imposed on other tenants. For example, on April 5, 2006, Rectrix received a letter from Gilmore indicating that it was in default under the lease terms for failing to pave certain areas. Two days later, Rectrix responded with a letter indicating that the purported defaults

were baseless given the impossibility of completing the work during the winter season. The requirement for Rectrix to pave these areas, like many other obligations imposed on Rectrix by the BMAC, Dunning, Gilmore and Wheatley, was not placed on other FBOs or Airport tenants.

## 8.   Defendants Make Good On Their Threats: The BMAC Stops Rectrix From Fueling

68.   After the January 19, 2006 MOU was executed, Rectrix entered into management agreements with Bombardier and CitationShares. Rectrix then began fueling aircraft that it managed.

69.   Of course, defendants the BMAC, Dunning, Gilmore and Mosby would not give up their extremely valuable monopoly on the sale of jet fuel. The BMAC would allow Rectrix to fuel only if it met additional conditions:  enter into a new MOU, make certain payments in connection with the fueling (which Rectrix was already doing) and allow the BMAC to review the management agreements. Notwithstanding that Rectrix should not have had to enter into an MOU, it complied with all of the BMAC's requests by entering into a new MOU on June 2, 2006 (while reserving its right to argue that this requirement was discriminatory), confirming that it made the requisite payments and allowing the BMAC access to the management contracts subject to the BMAC's

26

agreement to keep the contracts confidential at the request of the companies whose aircraft Rectrix was managing.

70. The June 2 MOU contained the same language as the previous MOU: Rectrix had the right to fuel aircraft that were "managed under exclusive contract." The BMAC and defendants Dunning, Gilmore and Mosby forced Rectrix to give up its right to fuel third parties in return for a contractual right to fuel the planes it owns, leases or manages.

71. Notwithstanding Rectrix's clear right under the MOU to fuel aircraft that it manages, as well as the BMAC's December 20, 2005 resolution and applicable FAA regulations, on June 16, 2006 -- two weeks after the MOU was signed -- the BMAC, through Mosby, informed Rectrix that Rectrix was not permitted to fuel aircraft that it manages under the contracts with Bombardier and CitationShares. The BMAC asserted that such fueling was prohibited by FAA regulations and the December 20 resolution.

72. In addition, after Rectrix responded that the fueling of managed aircraft was permitted by the BMAC's ruling and the MOU, as well as the FAA, Mosby informed Rectrix -- for the first time -- that it was not entitled to fuel aircraft on ramps that were not leased by Rectrix. Although other FBOs were able to fuel on the common ramps and Rectrix was asked by the Airport itself to provide other aviation services on these ramps, the BMAC -- at the same time it refused to rule on Rectrix's requests

27

for additional ramp space -- claimed that Rectrix providing jet fuel on common ramps presented a problem.

73.  On June 21, defendant Gilmore sent a letter to Rectrix's counsel asserting that Rectrix could not fuel aircraft that were not located on Rectrix's ramp (regardless of whether Rectrix managed such planes) and if it did otherwise, it would be in breach of its lease and subject to eviction.  The next day, Rectrix's counsel responded to the letter indicating that although the FAA allowed fueling of operated and managed aircraft and that the MOU expressly authorized fueling of managed aircraft, Rectrix would only fuel aircraft in the immediate vicinity of its ramp, which appeared to be the only basis for the threatened eviction.  After that letter, Rectrix continued to fuel its managed aircraft without any complaints from the BMAC until June 30.

74.  On June 30 -- a full week after Rectrix responded to Gilmore's letter as well as the beginning of the Friday of the July 4th weekend, one of the busiest weekends of the summer -- defendant Mosby delivered a letter informing Rectrix that it could not fuel its managed aircraft because of a "verbal confirmation" by the FAA that such fueling was not permitted.

75.  After Rectrix's counsel pointed out that they were not aware of any such ruling nor could there be any basis for it, Gilmore stated in a July 7 letter that Rectrix could only fuel

28

aircraft that it owns, an entirely new limitation that completely ignored the express terms of the BMAC's December 20, 2005 ruling and the June 2 MOU, and that had no basis whatsoever in FAA regulations. Gilmore then admitted to the defendants' prior threats and intention to keep the monopoly over jet fuel by asserting that **"[t]he Airport has informed your client time and time again that it would not relinquish its exclusive right to set [sic(sell)] jet fuel."** Rectrix immediately complied with Gilmore's directive and as of June 30 has ceased fueling any aircraft other than planes it owns.

**9. The BMAC's Unfair Treatment Of Rectrix Compared To The Treatment Of Other Aviation Services Providers At The Airport**

76. In addition to the retaliatory and disparate treatment discussed above, other operators received far more beneficial treatment from the BMAC in connection with the same on-airport aeronautical activities and services that Rectrix was trying to engage in, in violation of the BMAC's obligation to treat objectively, uniformly and fairly all similarly situated companies.

77. In August 2004, the BMAC allowed Floyd and Ronald Silvia (the "Silvias") to enter into lease terms far more favorable than those given to Rectrix. The BMAC granted the Silvias an 18-month rental abatement for airport hangar leases that Rectrix never received. The BMAC did not require the

29

Silvias to pay 3% of the revenues generated by their operations at the Airport as Rectrix was required to pay, and it granted the Silvias greater use of their facilities than Rectrix.

78.   The BMAC also approved construction of two hangars by the Silvias that did not comply with the Minimum Standards.   The Minimum Standards provide that if any "hangar or hangars are constructed for the rental of space for aircraft storage, such hangar or hangars shall be not less than 10,000 square feet in floor area."   The BMAC, however, approved two separate leases for two purportedly separate Silvia entities each of which was for a hangar of less than 10,000 square feet of gross floor area.

79.   This was done apparently to avoid review by the regional planning and regulatory agency, the Cape Cod Commission (the "CCC").   Under the regulations of the CCC, any project constructed on Cape Cod with a gross floor area over 10,000 square feet must be reviewed and approved.   Under the anti-segmentation rules of the CCC, the two Silvia hangars should have been considered as one project with a gross floor area of over 18,000 square feet.   Among other things, they had identical lease terms, common builders, common attorneys and were managed by two brothers.   Until Rectrix raised the issue of disparate treatment, however, the Silvias were never required by the BMAC to obtain CCC review of these hangars.