80.   This was all accomplished by the Silvias through companies incorporated by Dunning's law firm, Dunning & Kirrane, L.L.P. The firm incorporated Silvia Aviation, LLC on January 22, 2004, which became Silvia Aviation I, LLC on January 10, 2005. Silvia Aviation I is owned by Floyd Silvia. Then, on August 9, 2004, Kevin M. Kirrane, Dunning's partner, incorporated Silvia Aviation II which is owned by Ronald Silvia. Both company's leases were purportedly executed on August 13, 2004, before Silvia Aviation I existed as a legal entity. On December 29, 2004, Rectrix made a request to the Airport under the Freedom of Information Act for all leases of Airport tenants. On February 3, 2005, in response to Rectrix's request, Mosby sent by certified mail to Rectrix a copy of "all leases." However, copies of the two Silvia leases were not included in the response.

81.   When Cawley asked another BMAC Commissioner how the Silvias could get through the permitting process so quickly and effortlessly compared with the battle that Rectrix has fought at every turn, the Commissioner suggested that Rectrix's mistake was that it did not hire the law firm of Dunning & Kirrane, L.L.P. to do Rectrix's legal work. When Cawley noted that it would be unethical and a conflict of interest to do so, the Commissioner said, in substance, "That's the way things are done on the Cape."

31

## COUNT ONE
### (Racketeering Against All Defendants Except the BMAC for Violation of 18 U.S.C. § 1962(c), as an Associated-in-Fact Enterprise)

82. Rectrix repeats and realleges paragraphs 1 through 81 as if fully set forth herein.

## A.   The Enterprise

83. Defendants the BMAC, Dunning, Gilmore, Mosby, Sanchez and Wheatley, together with the Airport, the Town and the Town's Finance Director, as well as others unknown to plaintiff, constitute an "enterprise" of individuals and entities associated in fact as defined by 18 U.S.C. § 1961(4) (the "Enterprise"). This Enterprise, which operates in the District of Massachusetts and elsewhere, is engaged in and its activities affect interstate commerce.

### 1.   Purposes of the Enterprise

84. The purposes of the Enterprise include, among other things, a scheme to (i) wrongfully prevent others, including Rectrix, from selling jet fuel in competition with the BMAC's monopoly on the sale of jet fuel; (ii) illegally divert for Town use monies required by federal law to be expended on the Airport; (iii) fraudulently obtain millions of dollars in federal grant monies by making or causing to be made false representations to the FAA; and (iv) defraud the Town and its citizens, including Rectrix, of the intangible right of honest services of its public officials by, among other things, fraudulently concealing the

32

Minimum Standards from Rectrix and others, retaliating and discriminating against Rectrix and corruptly maintaining the BMAC's monopoly on the sale of jet fuel. Defendants used their positions with the BMAC and the Airport to obtain benefits for the Airport, the BMAC, the Town, themselves and others through corrupt means.

**2.    Members of the Enterprise**

85.    Defendants Dunning and Gilmore have been the leaders of the Enterprise since about 2001.

86.    Defendant Dunning was the Chairman of the BMAC from 2001 until approximately June 2005 and, along with defendant Gilmore, exercised effective control over many aspects of the BMAC. Defendant Dunning continues to be a Commissioner of the BMAC and exercised substantial control over its business.

87.    Defendant Gilmore is and for all times relevant to this Complaint was Counsel to the BMAC. He is responsible for the legal affairs of the BMAC and, along with defendant Dunning, exercises effective control over many aspects of the BMAC.

88.    Defendants Mosby and Wheatley are associated with and conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs.

89.    Defendant Mosby is and for all times relevant to this Complaint was the Manager of the Airport. As Airport Manager -- a full time, paid position appointed by the BMAC -- Mosby is

charged with the duty to administer, protect and control the operation, security and maintenance of the Airport.

90. Defendant Sanchez is the Airport Assistant Manager and a subordinate of Mosby.

91. Defendant BMAC, although not named as a defendant in the RICO claims, is a member of the Enterprise. The BMAC was created by a vote of the Town to maintain and operate the Airport. The BMAC was controlled in part by defendants Dunning and Gilmore who used it to carry out the illegal objectives of the Enterprise.

92. The Airport is a member of the Enterprise. The Airport is controlled by defendants the BMAC, Dunning, Gilmore, Wheatley, Mosby and Sanchez and was and is used by these defendants to carry out the illegal objectives of the Enterprise.

93. The Town's Department of Finance is a member of the Enterprise. The Department of Finance is used to carry out the illegal objectives of the Enterprise and is controlled by the Finance Director for the Town of Barnstable, who is also a member of the Enterprise. The Finance Director is directly responsible for various federal and local reports submitted to the FAA through the mail and over the wires.

94. Others known and unknown to Rectrix were and are associated with, conducted and participated, directly and

34

indirectly, in the conduct of the Enterprise's affairs, including but not limited to mail and wire fraud.

**B.     The Illegal Conduct**

### 1.     Defendants' Illegal Revenue Diversion And Fraudulent Grant Applications

95.    Instead of using Airport funds solely for the "capital or operating costs of the airport," as they were required under federal law to do, defendants diverted a significant amount of the Airport's revenues to fund Town expenses, including but not limited to salaries of town employees unrelated to the operation of the Airport.

96.    A comparison of the amounts reported to the FAA as being paid by the Airport to the Town with public statements by defendants and Town financial records corroborate admissions made by certain defendants that Airport revenues were being diverted and these records confirm that the Enterprise falsely reported to the FAA the amounts paid by the Airport to the Town.  For example, defendants Dunning and Mosby have bragged about how much money the Airport gives to the Town, however, a much smaller amount of money was reported to the FAA.   Indeed, defendant Mosby was quoted at a Town Council meeting in 2005 as saying, "This little airport is a good little golden goose for this town," even though, under federal law, the Airport should never produce any "gold" for the Town.

97. Airport sponsors receiving federal money are required by grant assurances and FAA policy to report annual income and expenses on a form known as FAA Form 127. They also must report all amounts paid by the airport to other units of government -- including to municipalities such as the Town of Barnstable -- and the purpose of such payments on a form known as FAA Form 126. The Town budget for fiscal year 2003 shows that $615,609 was budgeted for reimbursement from the BMAC to the Town while the FAA Form 126 for that year reports that only $365,609 was paid to the Town. Similarly, on its fiscal year 2003 FAA Form 127, the BMAC reported to the FAA that it had total revenues of $3,568,384 while the Town's "Statement of Revenues, Expenses and Changes in Fund Equity" for the same fiscal year reported that the BMAC actually had total revenues of $5,706,851. The FAA Form 127 for that year also reported that the BMAC had a net income of $387,549 while Town records for that year show a net income of $1,050,209.

98. Members of the Enterprise also obtained additional grant monies for the Airport by mailing or causing to be mailed to the FAA grant applications that contained false and fraudulent representations and promises concerning the use of grant monies and the Airport's future compliance with the grant assurances. In each of the applications for grant money from 2000 to 2005, the BMAC was required to represent that (a) it would not expend

grant monies for any uses other than Airport use, (b) it would
report annually all amounts paid by the Airport to any other
governmental unit, and (c) it would comply with other grant
assurances including those relating to self-fueling and the sale
of aviation fuel products.  In fact, at the time the BMAC made
the required representations, the members of the Enterprise
intended to continue diverting Airport revenues for use by the
Town and intended to wrongfully maintain its monopoly on the sale
of jet fuel.  Indeed, when most of these representations were
made, members of the Enterprise were fraudulently concealing the
existence of the Minimum Standards.  As a result of these false
and fraudulent representations, the Airport was able to obtain
millions of dollars in federal grant monies.

## 2.   Pattern of Racketeering Activity

99.   From in or before 2001 and until the present,
defendants Dunning, Gilmore, Mosby, Sanchez and Wheatley were
associated with an enterprise, as that term is defined in 18
U.S.C. § 1961(4), consisting of a group of persons associated in
fact, to wit, Dunning, Gilmore, Mosby, Sanchez, Wheatley, the
Airport, the BMAC, the Department of Finance of the Town of
Barnstable and its Finance Director for the period from in or
before 2001 and continuing until the present (the "Association-
in-Fact Enterprise"), which engages in, and whose activities
affect, interstate commerce, and, being associated with the

37

Association-in-Fact Enterprise, defendants did knowingly,
willfully and unlawfully conduct and participate, directly and
indirectly, in the conduct of the affairs and activities of the
Association-in-Fact Enterprise through a pattern of racketeering
activity, that is, the commission of racketeering acts set forth
herein, which included acts indictable under 18 U.S.C. § 1341
(mail fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1346
(honest services).

100. The objectives of defendants' fraudulent pattern of
conduct were to (i) prevent others, including Rectrix, from
selling jet fuel in competition with the BMAC's monopoly on the
sale of jet fuel; (ii) divert revenues from the Airport to the
Town of Barnstable; (iii) fraudulently obtain funding from the
federal government; and (iv) deprive the citizens of the Town of
Barnstable of their right to honest services of public officials.
By their knowing and willful misconduct, defendants have caused
harm to Rectrix, other Airport tenants and the citizens of the
Town of Barnstable, all as set forth herein.

101. In furtherance of their schemes to defraud,
defendants, among other acts, did the following:

- concealed the relevant and necessary Minimum Standards,
  which govern regulations for safety and operations at
  the Airport, from Rectrix, other FBOs and engineers
  charged with designing the Airport;
- attempted to pass off Self-Service Standards that
  allowed the Airport wrongfully to maintain exclusivity

38

on the sale of jet fuel as the only governing
standards;

- filed fraudulent forms with the FAA containing false
  figures about the use of the Airport's revenues;

- fraudulently obtained millions of dollars in federal
  grant monies between at least 2000 and 2005 by making
  false grant assurances, including misrepresenting use
  of Airport revenues;

- diverted monies from the Airport to support Town
  expenses that are not related to the operation of the
  Airport;

- favored tenants who were clients of or had used the
  legal services of the law firms of Dunning and Gilmore;

- delayed the opening of Rectrix's hangar by tortiously
  interfering with its engineers and consistently
  postponing necessary approvals;

- delayed and thwarted Rectrix's ability to self-fuel and
  to fuel planes it manages, including by forcing Rectrix
  to enter into an MOU to self-fuel and to fuel planes it
  manages and then breaching the MOU;

- completely denied Rectrix the right to sell jet fuel to
  third parties; and

- failed to give Rectrix's requests the fair and honest
  consideration they were due.

102.  To achieve their objectives and in furtherance of
their schemes to defraud, defendants engaged in and their conduct
as alleged herein constituted a pattern of racketeering activity.

103.  As part of their racketeering activities and in
furtherance of their schemes to defraud, each of the defendants
as set forth herein knowingly, willfully and unlawfully
transmitted and/or caused to be transmitted, by means of wire,
writings, signs, signals, pictures and sounds, to wit,
communications via facsimile, e-mail and telephone, in interstate
commerce, as alleged herein, in violation of 18 U.S.C. §§ 1343
and 1346.  Specifically, on or about the dates set forth below,

39

defendants as set forth herein did transmit and/or cause to be transmitted by means of wire communications in interstate commerce communications that either contained false representations or were made in furtherance of defendants' schemes to defraud, including, among others, the following transmissions known to Rectrix at this time:

| Use of Wires in Violation of 18 U.S.C §§ 1343, 1346 | | |
|---|---|---|
| Date | Subject Matter | From / To |
| 10/18/2000 | 2000 FAA Form 126 | BMAC, Sanchez, Finance Director to FAA |
| 10/18/2000 | 2000 FAA Form 125 (later became FAA Form 127) | BMAC, Sanchez, Finance Director to FAA |
| 11/05/2001 | 2001 FAA Form 126 | BMAC to FAA |
| 11/05/2001 | 2001 FAA Form 127 | BMAC, Mosby, Finance Director to FAA |
| 2002 | 2002 FAA Form 126 | BMAC to FAA |
| 2002 | 2002 FAA Form 127 | BMAC to FAA |
| 10/24/2003 | 2003 FAA Form 126 | BMAC, Finance Director to FAA |
| 10/24/2003 | 2003 FAA Form 127 | BMAC, Mosby, Finance Director to FAA |
| 2004 | 2004 FAA Form 126 | BMAC to FAA |
| 2004 | 2004 FAA Form 127 | BMAC to FAA |
| 01/22/2004 | Fax copy of "Self-Service Standards" with fax cover re "BMA Standards" | BMAC to Rectrix |
| January 2004 | Phone call with Mosby saying Self-Service Standards were all that existed. | Cawley to Mosby |
| June 2004 | Phone call with Mosby denying existence of Minimum Standards | Cawley to Mosby |
| 06/21/2004 | Phone call with Sanchez re Minimum Standards | Cawley to Sanchez |
| November 2004 | Phone call with Wheatley admitting revenue diversion | Wheatley to Cawley |
| 2005 | 2005 FAA Form 126 | BMAC to FAA |
| 2005 | 2005 FAA Form 127 | BMAC to FAA |

40

104. As part of their pattern of racketeering activity and in furtherance of and to assist their scheme and artifice to defraud Rectrix, defendants also knowingly, willfully and unlawfully, in violation of 18 U.S.C. §§ 1341 and 1346, did place and/or did cause to be placed in a post office or authorized depository for mail matter, any matter to be sent or delivered by the Postal Service, deposited or caused to be deposited any matter to be sent or delivered by any private or commercial interstate carrier, or took or received therefrom, any such matter, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter, that either contained false representations or was made in furtherance of defendants' schemes to defraud as set forth herein, including, among others, the following mailings known to Rectrix at this time:

| Use of Mails in Violation of 18 U.S.C. §§ 1341, 1346 | | |
| --- | --- | --- |
| Date | Subject Matter | From/To |
| 03/24/2003 | Letter attaching "original lease" without Minimum Standards attached | BMAC to Counsel for Rectrix |
| 02/03/2005 | Response to FOIA request for all leases that did not include Silvia Leases. Sent by certified mail. | Mosby to Rectrix |

105. In addition, as set forth below, defendants knowingly, willfully and unlawfully, in violation of 18 U.S.C. §§ 1341 and 1346, did place and/or did cause to be placed in a post office or

41

authorized depository for mail matter, any matter to be sent or delivered by the Postal Service, deposited or caused to be deposited any matter to be sent or delivered by any private or commercial interstate carrier, or took or received therefrom, any such matter, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter, that either contained false representations or was made in furtherance of defendants' schemes to defraud, including, among others, the following grant applications submitted to the FAA and the following grants from the FAA associated with such applications known to Rectrix at this time:

| Use of Mails in Violation of 18 U.S.C. §§ 1341, 1346 | | |
|---|---|---|
| Grant Year | Grant Application/Grant | Grant Amount |
| 2000 | Application For Grant To "Conduct Airport Master Plan Study" -- Grant 028-2000 | $103,241 |
| 2001 | Application For Grant To "Conduct Environmental Study" -- Grant 029-2001 | $551,304 |
| 2001 | Application For Grant To "Rehabilitate Taxiway/Apron" -- Grant 030-2001 | $335,649 |
| 2001 | Application For Grant To "Acquire Land For Approaches" -- Grant 031-2001 | $2,822,187 |
| 2002 | Application For Grant To "Improve Runway Safety Area - 33; Security Enhancements" -- Grant 033-2002 | $806,815 |
| 2002 | Application For Grant For "Security Enhancements" -- Grant 034-2002 | $274,495 |
| 2003 | Application For Grant To "Construct Runway Safety Area - 6-24" -- Grant 035-2003 | $2,812,094 |
| 2003 | Application For Grant To "Construct Runway Safety Area - 33" -- Grant 036-2003 | $168,952 |
| 2004 | Application For Grant To "Improve Runway Safety Area - 33" -- Grant 037-2004 | $1,663,450 |

| Use of Mails in Violation of 18 U.S.C. §§ 1341, 1346 | | |
|---|---|---|
| **Grant Year** | **Grant Application/Grant** | **Grant Amount** |
| 2004 | Application For Grant To "Acquire Snow Removal Equipment" -- Grant 038-2004 | $194,736 |
| 2004 | Application For Grant To "Improve Runway Safety Area - 33" -- Grant 039-2004 | $888,174 |
| 2005 | Application For Grant To "Acquire Aircraft Rescue & Fire Fighting Vehicle; Acquire Snow Removal Equipment" -- Grant 040-2005 | $727,890 |
| 2005 | Application For Grant To "Construct Terminal Building" -- Grant 041-2005 | $1,197,000 |
| 2005 | Application For Grant To "Update Airport Master Plan Study" -- Grant 042-2005 | $88,350 |

106. Certain information regarding defendants' internal and external communications relating to, and in furtherance of, their pattern of fraudulent conduct, including, but not limited to, telephone, e-mail communications and mailings is not entirely available to Rectrix or the general public and lies within the possession and control of defendants and third parties known and unknown to Rectrix.

107. As a direct result of defendants' pattern of racketeering activity, Rectrix was harmed by defendants' schemes to (i) deprive the public of its right to honest services; (ii) divert funds from the Airport to the Town; (iii) illegally obtain grant money from the FAA; and (iv) maintain a monopoly on the sale of jet fuel. To support these schemes, defendants engaged in the conduct described above that resulted in Rectrix being delayed and thwarted from becoming an FBO, treated differently than other FBOs, delayed and thwarted in its right

43

to self-fuel and to sell jet fuel to third parties and damaged in an amount to be proven at trial.

108. Rectrix, therefore, is entitled to recover from defendants the amount in which it has been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest and the costs of this suit, including attorneys' fees.

## COUNT TWO
### (Racketeering Against All Defendants Except the BMAC for Violation of 18 U.S.C. § 1962(c), Alternatively, the BMAC as the Enterprise)

109. Rectrix repeats and realleges paragraphs 1 through 108 as if fully set forth herein.

110. This Count is pled in the alternative to the allegations of an Association-in-Fact Enterprise set forth in Count One.

111. From in or before 2001 and until the present, defendants Dunning, Gilmore, Mosby, Sanchez and Wheatley were associated with an enterprise, as that term is defined in 18 U.S.C. § 1961(4) consisting of the BMAC from in or before 2000 to date (the "BMAC Enterprise"), which engages in, and whose activities affect, interstate commerce, and, being associated with the BMAC Enterprise, defendants did knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs and activities of the BMAC Enterprise through a pattern of racketeering activity, that is,

44

the commission of racketeering acts set forth herein, which included acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1346 (honest services).

112. As a direct result of defendants' pattern of racketeering activity set forth above, Rectrix was harmed by defendants' schemes to (i) deprive the public of its right to honest services; (ii) divert funds from the Airport to the Town; and (iii) illegally obtain grant money from the FAA. To support their schemes, defendants engaged in the conduct described above that resulted in Rectrix being delayed and thwarted from becoming an FBO, treated differently than other FBOs, delayed and thwarted in its right to self-fuel and to sell jet fuel, in an amount to be proven at trial.

113. Rectrix, therefore, is entitled to recover from defendants the amount in which it has been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest and the costs of this suit, including attorneys' fees.

## COUNT THREE
### (Conspiracy to Commit RICO Violations, Against All Defendants Except the BMAC, for Violation of 18 U.S.C. § 1962(d))

114. Rectrix repeats and realleges paragraphs 1 through 113 as if fully set forth herein.

115. From in or about 2001 and until the present, defendants, being persons associated with an Enterprise which

45

engaged in, and whose activities affected, interstate commerce, knowingly, willfully and unlawfully conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs and activities of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and 1962(d), by each defendant agreeing to personally commit or aid and abet the commission of at least two of the acts of racketeering charged herein.

116. The objects of the conspiracy were to (i) prevent Rectrix from selling jet fuel in competition with the BMAC's monopoly on the sale of jet fuel; (ii) continue to divert revenues from the Airport to the Town of Barnstable; (iii) fraudulently obtain funding from the federal government; and (iv) deprive the citizens of the Town of Barnstable of their right to honest services of public officials. Defendants' fraudulent schemes were furthered and assisted by acts of mail and wire fraud described above.

117. Rectrix, therefore, is entitled to recover from defendants the amount in which it has been damaged, to be trebled in accordance with 18 U.S.C. § 1964(c), together with interest and the costs of this suit, including attorneys' fees, as determined at trial.

## COUNT FOUR
### (Against the BMAC, Dunning, Gilmore, Mosby and Wheatley for Violation of Section 2 of the Sherman Act)

118. Rectrix repeats and realleges paragraphs 1 through 🔲 as if fully set forth herein.

119. The sale of jet fuel is the relevant product market and consists of at least two relevant sub-markets: the sale of jet fuel through self-fueling and the sale of jet fuel to third parties. The Airport is the relevant geographic market for the sale of jet fuel in the area, including the relevant sub-markets, because it is impractical and costly for jet-propelled aircraft to fuel elsewhere when they are in need of fuel to fly out of the Airport. Thus, the sellers of jet fuel at the Airport can only be in competition with each other and at present there is no competition for selling jet fuel to third parties.

120. Due to its governmental power to restrict economic activity at the Airport, the BMAC and those acting on its behalf, including defendants Dunning, Gilmore, Mosby and Wheatley have the power to regulate and restrict competitors such as Rectrix from selling fuel at the Airport. Thus, the BMAC and those who control it possess "monopoly power" in the jet fuel market at the Airport, including the power to determine the price for jet fuel.

121. The creation and maintenance of the monopoly on the self-fueling and third-party jet fuel markets exceeds the power granted to the BMAC either expressly or by necessary implication of Massachusetts or federal law and is not undertaken pursuant to any state policy or valid business justification. The BMAC had no right to a monopoly on self-fueling planes using jet fuel. Even if the BMAC had the lawful right to create a monopoly on the sale of jet fuel to third parties, they have given up that right both in adopting the Minimum Standards and by allowing other FBOs to sell aviation fuel for propeller planes. Therefore, the Airport's monopoly on the sale of jet fuel to third parties is discriminatory and unlawful.

122. The BMAC and defendants Dunning, Wheatley, Mosby and Gilmore have engaged in anticompetitive, dishonest, discriminatory and unlawful means to maintain the Airport's monopoly in the sale of jet fuel, including (i) concealing from Rectrix the Minimum Standards that expressly provide for FBOs to sell jet fuel and instead falsely passing off the Self-Service Standards as the only relevant and governing rules and regulations at the Airport; (ii) impeding Rectrix's ability to self-fuel its planes; (iii) forcing Rectrix to purchase jet fuel from the BMAC monopoly to self-fuel the planes it owns; (iv) precluding Rectrix from fueling planes it operates, leases or

48

manages; and (v) entirely precluding Rectrix from selling jet fuel to third parties.

123. Rectrix has been damaged by the unlawful monopoly power exercised by the BMAC, Dunning, Gilmore, Mosby and Wheatley on jet fuel sales at the Airport in that Rectrix has lost the profits it would have earned from the sale of jet fuel to its customers and has paid more than it otherwise would have to fuel the aircraft that it owns, operates or manages, and has instead had to pay the price as determined by the Airport for purchasing jet fuel.

124. The monopoly perpetrated by defendants affects a substantial amount of interstate commerce by, among other things, channeling fuel sales to the BMAC and away from other potential fuel vendors and artificially increasing the costs of jet fuel because the Airport does not engage in competitive bidding for its purchase of jet fuel and has no competitor in the sales of such fuel.

125. The actions of defendants with respect to the sale of jet fuel pose a continuing threat to free, unrestrained and competitive interstate trade.

126. Accordingly, defendants the BMAC, Dunning, Mosby, Wheatley and Gilmore have maintained a monopoly in violation of Section 2 of the Sherman Act.

49

127. Wherefore, Rectrix is entitled to an order enjoining defendants from restricting Rectrix from self-fueling and selling jet fuel to third parties subject to reasonable safety restrictions and awarding Rectrix damages in an amount to be proven at trial, to be trebled, including costs and attorneys' fees.

## COUNT FIVE
### (Against the BMAC, Dunning, Gilmore, Mosby and Wheatley for Violation of Massachusetts Antitrust Act, Mass. Gen. Laws Ch. 93 § 4)

128. Rectrix repeats and realleges paragraphs 1 through 127 as if fully set forth herein.

129. As set forth above in Count Four, Rectrix has alleged claims against defendants the BMAC, Dunning, Gilmore, Mosby and Wheatley under section 2 of the Sherman Act. Accordingly and pursuant to Ch. 93 § 1 of the Massachusetts General Laws, defendants have violated the Massachusetts Antitrust Act.

130. Therefore, defendants are liable for Rectrix's damages in an amount to be proven at trial.

## COUNT SIX
### (Against the BMAC, Dunning, Gilmore, Mosby, Sanchez and Wheatley for Violation of § 1983 Denial of Equal Protection)

131. Rectrix repeats and realleges paragraphs 1 through 130 as if fully set forth herein.

132. As set forth above, the BMAC, Dunning, Gilmore, Mosby, Sanchez and Wheatley acting under the color of law, have

consistently discriminated against Rectrix and treated them differently from other lessees and those seeking to be FBOs at the Airport in an effort to deter Rectrix from its attempts to operate an aviation services facility with jet fueling services. Such actions are wholly unrelated to any rational or legitimate state interest and are in violation of the right to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

133. The BMAC allows other FBOs to self-fuel and to sell the type of fuel the planes using such FBOs' hangars or ramps require. Yet, Rectrix "self-fuels" through an Air Cape Cod fuel tank and a restrictive MOU. Rectrix cannot sell the fuel it uses unlike other FBOs at the Airport and, despite the terms of the MOU, Rectrix is now allowed to fuel only aircraft it owns.

134. In addition, the BMAC allowed the Silvias to circumvent the CCC by building two hangars each under the 10,000 square foot minimum provided by the Minimum Standards, but with a combined total well in excess of the CCC's threshold for review. The BMAC also has given the Silvias rental abatements and provided other favorable lease terms to them that are not included in the Rectrix lease as described above. Further, the BMAC allowed the Silvias greater ramp access and usage than Rectrix's use of its ramp.

135. In sum, the BMAC has discriminated against Rectrix in constructing and operating its hangar, has tried to stop Rectrix from fully operating at the Airport and has made the entire process as difficult as possible. The BMAC even accused Rectrix of being in default of its lease without real -- as opposed to pretextual --legal or factual basis.

136. Defendants' discriminatory actions impinged on Rectrix's ability to do business at the Airport. Thus, defendants violated § 1983 and are responsible for the damages Rectrix suffered as a result.

## COUNT SEVEN
### (Against the BMAC, Dunning, Gilmore, Mosby and Wheatley for Retaliation against Plaintiffs for Exercising Constitutionally Protected Rights of Free Speech and Redress)

137. Rectrix repeats and realleges paragraphs 1 through 136 as if fully set forth herein.

138. Rectrix has for several years been very vocal about its opposition to the BMAC's monopoly on the sale of jet fuel, the BMAC's unlawful revenue diversion and the BMAC's discrimination, including the BMAC's discriminatory and improper treatment of the Silvias which resulted in a criminal investigation into the approval of the Silvia leases.

139. As described above, the BMAC, Dunning, Gilmore, Mosby and Wheatley, acting under color of law, have consistently and intentionally retaliated against Rectrix for attempting to

52

compete with the BMAC's monopoly on the sale of jet fuel, for disclosing the true Minimum Standards and the BMAC's fraudulent concealment of those standards, and for speaking about and asserting its right to petition the FAA for redress concerning the BMAC's unlawful, discriminatory and retaliatory conduct at the Airport. Most recently, defendants have even threatened to evict Rectrix from the Airport.

140. Rectrix is entitled to an order enjoining the BMAC, Dunning, Gilmore, Mosby and Wheatley from harassing Rectrix in retaliation for exercising its constitutionally guaranteed rights, including but not limited to an order preventing the BMAC from wrongfully evicting Rectrix from the Airport, and for attorneys' fees and costs of this suit.

## COUNT EIGHT
### (Against Dunning, Gilmore, Mosby, Sanchez and Wheatley for Civil Conspiracy)

141. Rectrix repeats and realleges paragraphs 1 through 140 as if fully set forth herein.

142. As set forth above, defendants Dunning, Gilmore, Mosby, Sanchez and Wheatley engaged in a common design to unlawfully divert funds from the Airport to the Town of Barnstable, to obtain FAA funds by misrepresenting the use of Airport revenues, and to defraud the public of the honest services of public officials.

53

143. In furtherance of these acts, these defendants conspired to conceal the existence of the Minimum Standards from Rectrix, engaged in a pattern of acts that delayed and frustrated Rectrix's ability to operate its corporate hangar at full capacity, including delaying requisite approvals, interfering with business contracts and attempting to restrict ingress and egress to the hangar, as well as refusing to allow Rectrix to sell jet fuel.

144. The actions of defendants were willful, malicious and fraudulent.

145. Such acts caused damages to Rectrix in an amount to be proven at trial.

146. Defendants named herein are jointly and severally liable for their tortious acts.

## COUNT NINE
### (Against the BMAC and Dunning for Tortious Interference With Contractual And Prospective Business Relations -- Horsely Witten)

147. Rectrix repeats and realleges paragraphs 1 through 146 as if fully set forth herein.

148. Defendants the BMAC and Dunning knew that Rectrix had entered into an agreement with Horsley Witten to design and construct Rectrix's hangar at the Airport.  Defendants also knew that Rectrix planned to engage Horsley Witten to perform

54

additional work for Rectrix at the Airport, including plans to develop a fuel farm.

149. Defendants knowingly and intentionally interfered with Rectrix's ability to contract with Horsley Witten by demanding that Horsley Witten cease certain work for Rectrix at the Airport. Defendants threatened Horsley Witten that if it did not cease working for Rectrix, and in particular any proposed plans concerning a fuel farm, the Airport would no longer use Horsley Witten for its own more lucrative projects, such as the construction of the new Airport terminal.

150. Because of defendants' actions, Horsley Witten refused to perform certain work for Rectrix. Rectrix then hired other engineering firms to perform such work at considerable cost and delay to the fuel farm project and Rectrix's ability to do business.

151. The actions of defendants were willful and morally reprehensible.

152. Rectrix was damaged by defendants' tortious interference in an amount to be proven at trial but not less than $50,000.

## COUNT TEN
### (Against the BMAC for Breach of Covenant of Good Faith and Fair Dealing -- Rectrix Lease)

153. Rectrix repeats and realleges paragraphs 1 through 153 as if fully set forth herein.

154. The BMAC and Rectrix entered into the Rectrix Lease, as well as amendments thereto. The BMAC owed Rectrix a duty of good faith and fair dealing in connection with the Rectrix Lease.

155. Under the Rectrix Lease, Rectrix had an expectation that it would receive the true rules and regulations that were in effect at the Airport and that the BMAC would, in good faith, allow Rectrix to alter the terms of the lease as appropriate. Instead, the BMAC acted in bad faith by concealing the Minimum Standards from Rectrix and delaying and interfering with Rectrix's ability to do business at the Airport as set forth above. The BMAC's actions secured an unfair advantage for the Airport to sell jet fuel at Rectrix's expense.

156. As a result of the BMAC's actions, Rectrix has been damaged in an amount to be proven at trial.

### COUNT ELEVEN
### (Against the BMAC for Specific Performance of the MOU)

157. Rectrix repeats and realleges paragraphs 1 through 156 as if fully set forth herein.

158. The BMAC required Rectrix to enter into the MOU in order to self-fuel and to fuel planes that it leases or manages. Under the FAA regulations, the MOU was not a requirement for such fueling and the BMAC has not required any other FBO to enter into an MOU in order to fuel.

159. Notwithstanding that the MOU requirement was
discriminatory, Rectrix entered into the MOU and then the BMAC
required Rectrix to renew the terms of the MOU to fuel aircraft
that it owns or manages.  However, the BMAC then informed
Rectrix that it could only fuel planes that it owns.  On July
12, 2006, Rectrix sent the BMAC copies of two exclusive
management contracts and requested that the BMAC allow Rectrix
to fuel the aircraft that it manages.  The BMAC refused to cure
its breach of the MOU and continues to prevent Rectrix from
fueling aircraft other than those it owns.

160. Under the MOU, Rectrix is entitled to dispense jet
fuel to aircraft under its exclusive management.  Rectrix is in
full compliance with the terms of the MOU.  The BMAC breached
the MOU by refusing to allow Rectrix to fuel aircraft under its
exclusive management in direct contravention of the plain terms
of the MOU.

161. The BMAC's breach of the MOU has virtually shut down
Rectrix's business and is causing tremendous damage to Rectrix's
goodwill, and Rectrix has no adequate remedy at law.

162. Accordingly, Rectrix seeks specific performance of the
MOU, and in particular the right to fuel aircraft that it
manages exclusively.

57

## COUNT TWELVE
### (Against the BMAC for Breach of Covenant of Good Faith and Fair Dealing -- MOU)

163. Rectrix repeats and realleges paragraphs 1 through 162 as if fully set forth herein.

164. The BMAC required Rectrix to enter into the MOU in order to fuel aircraft it owns, as well as those it leases or manages. The BMAC owes Rectrix a duty of good faith and fair dealing in connection with the MOU.

165. Under the MOU, Rectrix was entitled to dispense jet fuel to airplanes under its exclusive management. Rectrix had an expectation that defendants would, in good faith, allow Rectrix to dispense jet fuel to the aircraft for which it had such management agreements. Instead, the BMAC acted in bad faith by sending Rectrix cease and desist letters and threatening to evict it if it fueled any planes other than those it owned in direct contravention of the plain terms of the MOU. The BMAC's actions secured an unfair advantage for the Airport to sell jet fuel at Rectrix's expense and violated the covenant of good faith and fair dealing inherent in the MOU as set forth above.

166. As a result of defendants' actions, Rectrix has been damaged in an amount to be proven at trial.

## COUNT THIRTEEN
### (Against the BMAC, Gilmore and Mosby for Tortious Interference With Contractual And Prospective Business Relations -- Bombardier/CitationShares)

167. Rectrix repeats and realleges paragraphs 1 through 166 as if fully set forth herein.

168. Defendants the BMAC, Gilmore and Mosby knew that Rectrix had entered into agreements to provide aviation services for Bombardier and CitationShares, including management of their planes, at the Airport. Defendants also knew that Rectrix planned to provide fueling services to the managed planes of Bombardier and CitationShares.

169. Defendants knowingly and intentionally interfered with Rectrix's ability to perform its contractual obligations to Bombardier and CitationShares by demanding that Rectrix cease fueling planes that it manages. Defendants threatened Rectrix that if it did not cease fueling such planes, Rectrix would be evicted from the Airport.

170. Because of defendants' actions, Rectrix was forced to breach its agreements with Bombardier and CitationShares and disrupt its business.

171. The actions of defendants were willful and morally reprehensible.

172. Rectrix was damaged by defendants' tortious interference in an amount to be proven at trial.

59

## JURY TRIAL DEMAND

Rectrix demands trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Rectrix demands judgment as follows:

(a)  on Counts One through Three, against all defendants except the BMAC, jointly and severally, awarding Rectrix damages in an amount to be proven at trial, to be trebled in accordance with 18 U.S.C. § 1964 (c), with interest and the costs of this suit, including attorneys' fees;

(b)  on Count Four, against the BMAC, Dunning, Gilmore, Mosby and Wheatley, enjoining the defendants from restricting Rectrix from self-fueling at the Airport and from selling fuel to third parties and awarding Rectrix damages, jointly and severally, in an amount to be proven at trial, to be trebled, with interest and costs of this suit, including attorneys' fees;

(c)  on Count Five, against the BMAC, Dunning, Gilmore, Mosby and Wheatley, jointly and severally, awarding Rectrix damages in an amount to be proven at trial;

(d)  on Count Six, against all defendants, awarding Rectrix damages in an amount to be proven at trial;

(e)  on Count Seven, against the BMAC, Dunning, Gilmore, Mosby and Wheatley, enjoining such defendants from harassing Rectrix in retaliation for exercising its constitutionally guaranteed rights, including but not limited to, enjoining defendants from wrongfully evicting Rectrix from the Airport, and awarding costs of this suit, including attorneys' fees;

(f)  on Count Eight, against all defendants except the BMAC, jointly and severally, awarding Rectrix damages in an amount to be proven at trial;

(g) on Count Nine, against the BMAC and Dunning, awarding Rectrix damages in an amount to be proven at trial;

(h) on Counts Ten and Twelve, against the BMAC, awarding Rectrix damages in an amount to be proven at trial;

(i) on Count Eleven, against the BMAC, awarding Rectrix specific performance of the MOU;

(j) on Count Thirteen, against the BMAC, Gilmore and Mosby, awarding Rectrix damages in an amount to be proven at trial;

(k) awarding punitive damages where appropriate in an amount to be determined by the trier of fact; and

(l) awarding any and all further relief that the Court deems just and proper.

Dated: July 20, 2006

Respectfully submitted

By: _Anne Robb_

Steven L. Schreckinger (BBO #447100)
Anne Robbins (BBO #561968)
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street
Boston, Massachusetts 02110
(617) 951-0800
(617) 951-0811 (fax)

Of Counsel:

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Marc E. Kasowitz (MK-2597)
Daniel J. Fetterman (DF-9093)
Kara F. Headley (KH-0114)
Christian T. Becker (CB-5548)
1633 Broadway
New York, New York 10019
(212) 506-1700
(212) 506-1800 (fax)

Attorneys for Plaintiff Rectrix Aerodrome Centers, Inc.

61