UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-11246-RGS

RECTRIX AERODOME CENTERS, INC.

v.

BARNSTABLE MUNICIPAL AIRPORT COMMISSION,
et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

July 10, 2009

STEARNS, DJ

On July 20, 2006, Rectrix Aerodome Centers, Inc. (Rectrix), filed a thirteen-count

Complaint against the Barnstable Municipal Airport Commission (BMAC or Airport), and

five of its Commissioners.[1]   On August 27, 2007, defendants filed a motion to dismiss

Rectrix's claims for violation of section 2 of the Sherman Act (Count IV), and the

Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 4 (Count V). On February 15,

2008, the court dismissed the claims, finding that the defendants were immune from

antitrust liability under the state action doctrine.  Now before the court is defendants'

motion for summary judgment on the balance of plaintiff's claims: violations of the federal

anti-racketeering statute (RICO), 18 U.S.C. § 1962, *et seq.*; violations of the rights to due

process and equal protection, 42 U.S.C. § 1983 (the Federal Civil Rights Act); and

---

[1]The named Commissioners are Michael Denning, Bruce Gilmore, Larry Wheatley,
Quincy Mosby, and Francisco Sanchez.

retaliation for Rectrix's exercise of its right to free speech.[2] The court heard oral argument on June 19, 2009.

## BACKGROUND

The material facts, viewed in the light most favorable to Rectrix as the nonmoving party, are as follows.[3]  In 2002, Rectrix entered into a long-term lease with the BMAC to build and operate a private jet hangar at the Airport.  The lease permitted Rectrix to apply to become a fixed-base operator (FBO) as it expanded its business.[4]  Article 4 of the lease provided, in part,

> 2a.  It is further agreed that Lessee shall not conduct or permit to be conducted on said premises any flight schools, or aircraft refueling activities specifically relating to, and including resale of aviation or jet fuels, all subject to 2(b) below.
>
> 2b.  Lessee may at any time during the term of this Lease . . . submit in writing to the [BMAC], Lessee's desire to modify or expand its scope of operation.  Lessee agrees that any change in its scope of operation may be subject to negotiable rates and charges, with agreed upon terms and conditions to be executed by both parties on separate letters of agreement.

In addition, the lease specifically incorporated the "rules and regulations in effect at the time of the signing . . . ."

The Airport is governed by various rules and regulations, some self-promulgated and others issued by the Federal Aviation Agency (FAA).  They include the FBO

---

[2]Rectrix also asserts state-law claims for civil conspiracy; tortious interference with contractual and prospective business relations; breach of the covenant of good faith and fair dealing; and a demand for specific performance of a Memorandum of Understanding.

[3]Where facts are relevant only to a specific claim, they will be discussed in the context of that claim.

[4]An FBO is an airport service center providing fuel, oil, and hangar storage.

Standards (Minimum Standards); the Standards of Conduct for Persons and Businesses;

the Guidelines for Construction, Alteration, and Improvements at the Airport (Construction

Guidelines); and the Airport Self-Service Standards (Self-Service Standards).  Under the

terms of the Self-Service Standards, FBOs are not permitted to sell jet fuel.[5]  The Minimum

Standards, however, offer the possibility that an FBO might obtain permission to sell jet

fuel.  Article III, paragraph (e) of the  Minimum Standards provides:

> A fixed base operator shall provide all fuel services, including the sale and
> storage of 80-octane, 100-octane, and jet fuel, for as long as these grades
> are normally available for resale.  The [BMAC] may limit the types of fuel to
> be sold.[6]

Defendants did not disclose the Minimum Standards to Rectrix until June of 2004, two

years after Rectrix's lease was executed.  Rectrix claims that only after it parsed through

the Minimum Standards, did it realize that it had a right to sell jet fuel.  However, when

Rectrix applied to sell jet fuel as an FBO, defendants allegedly responded with a campaign

of  intimidation,  discrimination,  and  retaliation  undertaken  to  preserve  their  illegal

monopoly.

The Airport on occasion submits applications to the FAA for grants to fund airport

development, planning, and aviation-related projects.  As a condition of funding, the FAA

requires the Airport to comply with certain assurances.  Among the pertinent grant

guarantees are those relating to the exercise of exclusive rights, use of airport revenues,

and economic nondiscrimination.

---

[5]This prohibition has been in effect since at least 1979.

[6]Non-jet aircraft use 80 and 100 octane aviation fuel, commonly referred to as "avgas."  FBOs have been allowed to sell avgas at the Airport since 1983.

DISCUSSION

Rectrix's primary claim is that defendants are unlawfully diverting Airport revenues generated by a monopolization of the sale of jet fuel to the Town of Barnstable. According to Rectrix, the BMAC has illegally diverted (over time) $178,000 in Airport revenues to the Town Treasury.

1. RICO

To state a successful RICO claim, a plaintiff must allege four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). Under the RICO statute, the term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). "Such a group need not have a hierarchical structure or chain of command." Boyle v. United States, 129 S.Ct. 2237, 2245 (2009). However, "[t]he . . . failure to identify any enterprise, distinct from a named person defendant, is fatal under RICO." Doyle v. Hasbro, Inc., 103 F.3d 186, 191 (1st Cir. 1996). To conduct or participate, directly or indirectly, in the affairs of an enterprise requires a showing that a defendant took "some part in directing [the enterprise's] affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).

A "pattern" of racketeering activity means the commission of at least two related predicate acts over a span of years. See Schultz v. Rhode Island Hosp. Trust Nat'l Bank,

4

N.A., 94 F.3d 721, 731-732 (1st Cir. 1996).  The related predicate acts must have the same or similar purposes, participants, victims, or methods, or otherwise be interrelated by distinguishing characteristics, and not be isolated events. Feinstein v. Resolution Trust Corp., 942 F.2d 34, 44 (1st Cir.1991). "Racketeering activity" includes any predicate act "which is indictable under . . . section 1341 (relating to mail fraud)." Bridge v. Phoenix Bond & Indem. Co., 128 S.Ct. 2131, 2138 (2008).

To have standing under RICO, a plaintiff must show that an injury to its business or property was "caused by the predicate acts [in this case] of wire and mail fraud." Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 17 (1st Cir. 2000).  RICO causation must be established according to the familiar "proximate" rule of tort law.  See Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992).  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).

Rectrix sets out three separate enterprise theories for RICO purposes.[7]  Common to each theory is the allegation that defendants perpetrated a scheme

> aimed at continuing to perpetuate and maximize [defendants'] unlawful diversion to the Town of Airport revenues (substantially derived from jet fuel sales) through maintaining their monopoly over such sales and preventing Rectrix and others from selling jet fuel at the Airport.

---

[7]The first alleges an association-in-fact comprised of the individual defendants as the enterprise; the second alleges the BMAC as the enterprise; and the third alleges a conspiracy among all defendants to violate the RICO statute.

According to Rectrix, defendants furthered their scheme by using the mails, telephone, and facsimile lines to transmit fraudulent material.  Rectrix alleges numerous specific instances where defendants committed mail fraud by: (1) representing to Rectrix that only the Self-Service Standards applied, while fraudulently concealing the existence of the Minimum Standards;[8] (2) falsely reporting to the FAA the amount of the Airport's payments to the Town; and (3) falsely representing to the FAA that it was not diverting revenues or discriminating against tenants.  Rectrix argues that defendants' scheme cost it $6.4 million in lost sales of jet fuel, as well as $700,000 in increased construction and permitting costs.  The court will address the allegations in turn.

### A.  Concealment of the Minimum Standards

As Rectrix acknowledged at oral argument, the "central part" of its RICO theory is the alleged concealment of the existence of the Minimum Standards.  Rectrix argues that the express terms of the Minimum Standards give it the right to sell jet fuel.  Contract interpretation is ordinarily a question of law to be decided by the court.  Nadherny v. Roseland Prop. Co., 390 F.3d 44, 48 (1st Cir. 2004); Leblanc v. Friedman, 438 Mass. 592, 596 (2003).  A contract is to be construed as a rational business instrument giving effect to the intent of the parties.  No part of a contract is to be ignored; words are to be interpreted in the context in which they are used, while measured against the background of other indicia of the parties' intent.  Starr v. Fordham, 420 Mass. 178, 190 & n.11 (1995).  "Whether or not a term as used by parties to a contract is ambiguous is a question of law.

---

[8]Rectrix claims that despite repeated demands for all regulations that applied at the Airport, defendants concealed the existence of the Minimum Standards until 2004, when a "whistleblower" brought them to the attention of Rectrix's counsel.

. . . However, where a term is ambiguous, its meaning presents a question of fact."
Compagnie de Reassurance D'Ile de France v. New Eng. Reins. Corp., 57 F.3d 56, 75 (1st Cir. 1995).  See also Basis Tech. Corp. v. Amazon.com, Inc., 71 Mass. App. Ct. 29, 36 (2008) (same).

The record does not support Rectrix's argument that it enjoyed the uninhibited right to sell jet fuel.  The Minimum Standards, the source of Rectrix's claimed entitlement, make clear that the BMAC had the power to regulate the on-site sale of jet fuel.  While the Minimum Standards provide that an FBO "shall" provide services including the sale of jet fuel, the very next sentence declares that "the [BMAC] may limit the types of fuel to be sold." "[T]he court must construe all words that are plain and free from ambiguity according to their usual and ordinary sense."  Suffolk Constr. Co., Inc. v. Lanco Scaffolding Co., Inc., 47 Mass. App. Ct. 726, 729 (1999).  The Minimum Standards plainly reserve to the BMAC the right to limit any fuel to be sold.[9]  The word "limit," as standard dictionary definitions make clear, means to restrict, confine, allot, or set boundaries.  RANDOM HOUSE UNABRIDGED DICTIONARY 1115 (2d ed. 1993); WEBSTER'S NEW INTERNATIONAL

---

[9]This is consistent with the FAA's historical acceptance of the Airport's monopoly over the sale of jet fuel.  The FAA has been aware of, and has approved, the BMAC's exclusive sale of jet fuel since at least December of 1982.  The FAA informed the Airport Manager by letter dated December 14, 1982, that

it [is] within the prerogative of the Town of Barnstable as owner of the airport to retain the exclusive right to sell fuel.  The Town can give away as much of that right as they so choose as long as they make the same privilege available to other fixed base operators.

The FAA acknowledged the BMAC's proprietary right to sell jet fuel as recently as January of 2007, after the FAA conducted an on-site compliance review.

DICTIONARY 1434 (2d ed. 1961).  Cf. BLACK'S LAW DICTIONARY 939 (7th ed. 1999)

("*n*. 1.  A restriction or restraint.  2.  A boundary or defining line.  3.  The extent of power,

right, or authority.").[10]

Rectrix, in a last gasp effort, argued for the first time during the motion hearing that

the limiting authority granted to the BMAC by the Minimum Standards was open to

ambiguity because "grades" of fuel are different from "types" of fuel.  Contract language

is ambiguous only "where an agreement's terms are inconsistent on their face or where the

phraseology can support reasonable difference of opinion as to the meaning of the words

employed and the obligations undertaken." Fashion House, Inc. v. K mart Corp., 892 F.2d

1076, 1083 (1st Cir. 1989).  "[A]n ambiguity is not created simply because a controversy

exists between parties, each favoring an interpretation contrary to the other's." Jefferson

Ins. Co. of New York v. City of Holyoke, 23 Mass. App. Ct. 472, 475 (1987).  See also

Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998).

The court finds no support in the record for Rectrix's attempt to distinguish between

"grades" and "types" of fuel.  Rectrix offers no evidence to support this late-blooming

theory - the argument is not discussed in its brief, nor are any facts identified in the record

to show that the parties conducted themselves with differing understandings of the terms

"types of fuel."  Because there is no ambiguity, the court finds as a matter of law that the

BMAC is entitled under the Minimum Standards to prohibit the sale by FBOs of jet fuel at

---

[10]The BMAC also makes a convincing argument that as a quasi-governmental agency, its interpretation of its own regulations (the Minimum Standards) is entitled to deference. See Massachusetts Hosp. Ass'n, Inc. v. Dep't of Med. Security, 412 Mass. 340, 345-346 (1992); Cohen v. Bd. of Water Comm'rs, 411 Mass. 744, 748 (1992).  Cf. Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen, 93 F.3d 997, 1002 (1st Cir. 1996).

the Airport.  Because Rectrix can not show that defendants' alleged concealment of the Minimum Standards was a proximate cause of any injury to it, a RICO claim based on the occulation of the Standards necessarily fails.  See Holmes, 503 U.S. at 268.

### B.  Fraudulent Representations to the FAA

Rectrix's next focus is on the allegedly fraudulent grant assurances and financial statements transmitted by the BMAC to the FAA.  Even were the court to agree with Rectrix that the accused transmissions were fraudulent (the court makes no such determination), Rectrix has failed to demonstrate that they were a proximate cause of any injury.  It is true that Rectrix is not required to show "first-party reliance," that is, that it directly "relied on the defendant's alleged misrepresentations" in order to show the requisite RICO causation. Bridge, 128 S.Ct. at 2145.  However, a plaintiff, if it is to meet the proximate cause requirement, is still required to show injury "by reason of a RICO violation." Id. at 2141. The Supreme Court in Bridge reiterated its holding in Holmes that a showing of proximate cause "'demand[s] . . . some direct relation between the injury asserted and the injurious conduct alleged.'"  Bridge, 128 S.Ct. at 2142, quoting Holmes, 503 U.S. at 268.

Rectrix claims that it is has been injured by: (1) being denied FBO status; (2) being denied the right to sell jet fuel to third parties; (3) and being treated "differently" than other FBOs.  Rectrix cannot demonstrate, however, that any of its purported injuries arise from statements made by the BMAC to the FAA.  Rectrix essentially argues that defendants' fraudulent statements to the FAA "concealed and perpetuated its scheme" to divert revenues to the Town, thereby impeding the FAA from taking steps to dismantle defendants' jet fuel monopoly.  The eventuality posed by Rectrix - that the FAA might

9

someday revoke the BMAC's proprietary right to sell jet fuel is far too "speculative and remote," particularly in light of the FAA's consistent condonation of the BMAC's status as the Airport's sole jet fuel provider. See Bridge, 128 S.Ct. at 2144.

The Supreme Court considered similar factual allegations in Anza, 547 U.S. 451. In that case, plaintiff alleged that defendant had submitted fraudulent tax returns to the State of New York to conceal the fact that it had failed to collect required sales taxes. Plaintiff theorized that defendant's purpose was to pass the tax savings on to customers in the form of lower prices to gain sales and market share advantage. See id., 547 U.S. at 454. The Court rejected plaintiff's RICO theory, reasoning that "[t]he direct victim of this conduct was the State of New York, not [plaintiff]. It was the State that was being defrauded and the State that lost tax revenue as a result. . . . The cause of [plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." Id. at 458. The same reasoning applies here. If there is a victim to be found lurking among the present allegations, it would be the FAA, not Rectrix. The requirement of a direct causal link "is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." Id. at 460. The court is confident that if the FAA were to conclude that it was the victim of a fraud at the hands of defendants, it has the means and ability to seek the appropriate redress.

As all of Rectrix's RICO claims necessarily fail, the motion for summary judgment will be ALLOWED as to Counts I through III of the Complaint.

2. Equal Protection

10

Rectrix alleges that it is being denied equal protection because the BMAC has treated other Airport tenants on more favorable terms.  The Fourteenth Amendment prohibits a state from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.  To succeed on a "class of one" equal protection claim, Rectrix must show that it has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); Wojcik v. Massachusetts State Lottery Comm'n, 300 F.3d 92, 104 (1st Cir. 2002) (same).  Cf. DuPont v. Comm'r of Corr., 448 Mass. 389, 399 (2007).  Two entities are "similarly situated" if "a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant respects." Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008) (citation and internal quotation omitted).  "[T]he cases must be fair congeners.  In other words, apples should be compared to apples." Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernandez, 367 F.3d 61 (1st Cir. 2004).

Moreover, a distinction that does not affect a suspect class need only have a rational basis to pass constitutional muster.[11]  "Under rational basis scrutiny, a classification will withstand a constitutional challenge as long as it is rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational. . . . Courts

_____

[11]Rectrix does not claim, nor could it plausibly do so, that FBOs fall within a "suspect class."

11

applying the rational basis standard must give considerable deference to legislative policy determinations and refrain from setting aside a statutory discrimination if 'any state of facts reasonably may be conceived to justify it.'" LCM Enters., Inc. v. Town of Dartmouth, 14 F.3d 675, 679 (1st Cir. 1994), quoting Bowen v. Gilliard, 483 U.S. 587, 600-601 (1987). See also Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 219-220 (1st Cir. 1994). "The question is not what went on in the mind of the state actor but whether anyone, including the judge, can conceive of a rational reason for such a classification." Jeneski v. City of Worcester, 476 F.3d 14, 17 (1st Cir. 2007).

Rectrix's claim that it is receiving differential treatment is argued in mostly conclusory terms. Although Rectrix compares itself to all of the "Airport tenants as a whole," it offers only two examples of tenants with whom it claims to be similarly situated. Rectrix alleges that Griffin Aviation was allowed to use a public ramp to which it was denied access. However, Rectrix does not bring forward any facts demonstrating a similarity between it and Griffin. The same is true with respect to Silvia Aviation, an entity that Rectrix alleges was run by defendants' "cronies." According to Rectrix, the Silvias have received preferential treatment in the form of rate abatements and the approval of the construction of two hangars under 10,000 square feet.[12] In addition, Rectrix claims that the Silvias pay only ground rent, while Rectrix must pay an additional 3 percent commission on the Airport revenues that it earns.

---

[12]According to Rectrix, the hangars were deliberately sized under 10,000 square feet to avoid any zoning oversight by the Cape Cod Commission (CCC).

Defendants for their part argue, and convincingly so (given the facts), that Rectrix is not even remotely similarly situated to the Silvias who rent "T-hangars" for the storage of non-commercial, non-jet (piston-driven) aircraft, and who are not, like Rectrix, in the business of providing aeronautical services.  Defendants also explain that the abatements were the result of special circumstances that led the BMAC to compensate the Silvias when they were forced to relocate on the Airport grounds, and that all FBOs – not just Rectrix – are required to pay the 3 percent commission.[13]  Rectrix does not attempt to rebut defendants' factual showing; it simply urges the court to leave the issue of whether Rectrix is similarly situated to the Silvias to the jury.  Rectrix's argument reduces itself to the hyperbolic plaint that "no other FBO or prospective FBO at the Airport has been subjected to such discrimination and retaliation."

This does not come close to meeting Rectrix's burden on summary judgment.  The similarly situated requirement "demands more than lip service.  It is meant to be a 'very significant burden.'"  Cordi-Allen v. Conlon, 494 F.3d 245, 251 (1st Cir. 2007) (citation omitted).  It is true that "[t]he formula for determining whether individuals or entities are 'similarly situated' for equal protection purposes is not always susceptible to precise demarcation."  Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp., 246 F.3d 1, 9 (1st Cir. 2001).  But, "the burden that a class of one plaintiff must carry at the summary judgment stage is considerably heavier than a mere showing that others have applied, with more auspicious results, for the same benefit that [it] seeks."  Cordi-Allen,

---

[13]Because the Silvias are hangar-keepers who do not provide aeronautical services, they, like other non-FBOs, do not pay commission fees.

494 F.3d at 252.  See also Pagan v. Calderon, 448 F.3d 16, 34 (1st Cir. 2006) (where a decision-maker has discretionary authority to award or withhold a benefit, "a plaintiff who grounds an equal protection claim on the denial of that benefit faces a steep uphill climb."). Here, Rectrix has utterly failed to identify any "*specific instances* where persons *situated similarly in all relevant aspects* were treated differently." Buchanan v. Maine, 469 F.3d 158, 178 (1st Cir. 2006) (emphases in original).[14]  A court can properly grant summary judgment where "it is clear that no reasonable jury could find the similarly situated prong met." Cordi-Allen, 494 F.3d at 252.  Such is the case here.  The motion for summary judgment will be ALLOWED as to Count VI.[15]

   3. Injunctive Relief

   Rectrix claims that it has been subjected to retaliation as punishment for: (1) attempting to compete with the BMAC's jet fuel monopoly; (2) publicly insisting that the BMAC operate the Airport according to all applicable rules and regulations, including the

---

   [14]The court notes that in matters of zoning regulation, which share similarities with the Airport's regulatory environment, "departures from administrative procedures established under state law or the denial of a permit based on reasons illegitimate under state law[] do not normally amount to a violation of [a] developer's federal constitutional rights." PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991).  This is because "[i]f disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denial would become subject to litigation in federal court." Collins v. Nuzzo, 244 F.3d 246, 251 (1st Cir. 2001) (citation omitted).  See also City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985) (in the equal protection context, states have "wide latitude" when acting in the economic sphere).

   [15]Rectrix's due process argument fails for the same reason.  If a regulation does not violate equal protection, "it follows *a fortiori* that [it] does not violate the Fourteenth Amendment's Due Process Clause." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 470 n.20 (1981).

Minimum Standards; (3) filing a complaint against defendants with the FAA; and (4) exposing the "cronyism" between the BMAC and the Silvias. Rectrix purports to bring this claim under the First Amendment's guarantee of free speech.

At the outset, the court notes that this claim is in an unusual posture because Rectrix does not seek damages for any alleged retaliation; it seeks only equitable relief. Nor does Rectrix offer much by way of substance on the merits of the claim, other than the conclusory argument that "defendants retaliated against Rectrix and thereby violated Rectrix's rights . . . ."[16] Claims of retaliation for the exercise of First Amendment rights are cognizable under 42 U.S.C. § 1983. Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004). However, to prevail on a section 1983 retaliation claim, Rectrix must show "that [its] conduct was constitutionally protected, and that [its] conduct was a 'substantial factor' or . . . a 'motivating factor' for the [defendants'] retaliatory [conduct]." Id. at 17, quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). The defendants may avoid liability "by showing that '[they] would have reached the same decision . . . even in the absence of protected conduct.'" Id.

---

[16]Rectrix states that defendants imposed unnecessary requirements in connection with its application for additional ramp space, and delayed ruling on the application, refused to sign Rectrix's lease amendment without prior approval of the CCC, knowing that the CCC would not approve the project without a lease amendment. Defendants additionally proposed to locate a fuel storage area in a site that would have impeded the movement of jets at Rectrix's facility (and then required Rectrix to pay for the site plan to move the fuel storage); delayed ruling on Rectrix's request to become an FBO; imposed discriminatory conditions on Rectrix's efforts to lease a fuel storage tank; implemented a fueling policy that applied solely to Rectrix; interfered with Rectrix's relationship with its architect; and threatened Rectrix's CEO, Richard Cawley, in some unspecified fashion.

The relief sought by Rectrix is an injunction prohibiting defendants "from harassing Rectrix in retaliation for exercising its constitutionally guaranteed rights, including but not limited to, enjoining defendants from wrongfully evicting Rectrix from the Airport." Complaint, at Prayer for Relief, section (e).   "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-507 (1959).   "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974).   To be entitled to a forward-looking remedy, a plaintiff must satisfy the basic requisites of equitable relief – "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." Id. at 502.   It is not enough for a plaintiff to assert that it "could be" subjected in the future to the effects of an unlawful policy or illegal conduct by a defendant – the prospect of harm must have an "immediacy and reality." Golden v. Zwickler, 394 U.S. 103, 109 (1969).   See also Lopez v. Garriga, 917 F.2d 63, 68 (1st Cir. 1990) (an injunction seeker must show that it is "subject to continuing irreparable injury for which there is no adequate remedy at law.").

Rectrix has not met its burden of demonstrating any threat of immediate injury. Most of the complained-of conduct took place in 2004 and 2005.   Since filing its Complaint in 2006, Rectrix has not offered any facts to suggest a looming prospect of imminent harm. The only specific relief sought is protection from the threat of eviction; there is nothing in the record that suggests that defendants have made any such threat.   Nor has Rectrix shown that any injury it might incur in the future is without an adequate remedy at law.   See

<u>Charlesbank Equity Fund II, LP v. Blinds to Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).
The motion for summary judgment will be <u>ALLOWED</u> as to Count VII.

       3.  <u>State Law Claims</u>

All of the claims over which this court has original jurisdiction having been
dismissed, the court (consistent with its customary practice) will decline to exercise
supplemental jurisdiction over the remaining state law claims.  <u>See</u> 28 U.S.C. § 1367(c).
<u>See</u> <u>also</u> <u>Carnegie-Mellon Univ. v. Cahill</u>, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual
case in which all federal-law claims are eliminated before trial, the balance of factors to be
considered under the pendent jurisdiction doctrine – judicial economy, convenience,
fairness, and comity – will point toward declining to exercise jurisdiction over the remaining
state-law claims.").

<u>ORDER</u>

The motion for summary judgment is <u>ALLOWED</u> as to Counts I, II, III, VI, and VII,
and judgment will enter for defendants on these counts. The court declines jurisdiction
over the pendent state-law claims.  The Clerk will notify the parties and close the case.

       SO ORDERED.

       /s/ Richard G. Stearns

       _____
       UNITED STATES DISTRICT JUDGE

17